## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Matthew J. Longworth, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Louisville Division. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516 (1). I have been a Special Agent with the ATF since May of 2022. My duties as a Special Agent include the investigation of criminal violations of Federal Firearms and Narcotics laws. Throughout my law enforcement career I have been involved in numerous investigations related to prohibited persons possessing firearms, persons trafficking firearms and persons distributing controlled substances. I have been involved in the execution of search warrants and arrests resulting from prohibited persons possessing firearms, the distribution of controlled substances, and the concealing of drug related assets.

2. Prior to my employment as an ATF Special Agent, I was employed with the St. Louis County Police Department from June 2017 to May 2022. During this time, I was a state certified police officer and was responsible for patrol activities as well as numerous complex investigations primarily involving firearms and narcotics offenses. I am a graduate of the St. Louis County Municipal Police Academy, as well as the Federal Law Enforcement Training Center and the ATF National Academy. As a result of my two thousand plus hours of training and lived experience as an ATF Special Agent (S/A) and

police officer, I am familiar with State and Federal criminal laws and investigations of violations therein.

3. I am familiar with the information contained in this affidavit through my own personal participation in the investigation, my review of documents and records, and my conversations with other law enforcement officers and agents. Because this affidavit is submitted in support of application for a criminal complaint and arrest warrant, I have not included every fact known concerning this investigation. I have, however, set forth a statement of fact and circumstances sufficient to establish probable cause for the issuance of an arrest warrant.

4. The United States, including The Bureau of Alcohol, Tobacco, Firearms and Explosives, is conducting a criminal investigation of Christopher GARDNER (B/M, DOB: 03/06/1991), hereinafter GARDNER, regarding violations of 18 USC 922(g)(1), 18 USC 933, and 18 USC 371.

5. In September of 2024, ATF began conducting controlled firearms and narcotics purchases from a convicted felon and firearms trafficker identified as Sukhjit BAINS (Arabic/Male, DOB: 01/27/1974), hereinafter BAINS, utilizing an ATF confidential informant (CI). From September 25, 2024, through October 25, 2024, ATF conducted four (4) controlled purchases from BAINS, purchasing thirty (30) firearms and various quantities of MDMA, methamphetamine, and fentanyl. Based on investigation, BAINS' statements to the CI, and BAINS' felony status, ATF believes BAINS sourced some, or all, of the CI-purchased firearms from various individuals. ATF identified GARDNER as one of the individuals BAINS obtained firearms from.

6. On or about October 30, 2024, ATF attempted to conduct another controlled purchase of firearms from BAINS through the CI. The CI spoke with BAINS via both recorded text messages and voice calls on multiple occasions attempting to set up the controlled purchase. During one of the calls, where BAINS and the CI were discussing firearms for sale, BAINS placed the phone call on speaker phone and introduced the CI to "Crunch". At the time of the call, ATF had only identified "Crunch" as an unknown male. BAINS continued telling the CI that they, BAINS and "Crunch", were trying to put together something for the CI. BAINS advised he had told "Crunch" about his relationship and past dealings with the CI. BAINS stated "Crunch" had a lot more access to "them things" than he does. Based on the context of the conversation and my training and experience, I believed BAINS is referring to firearms when he stated, "them things". BAINS advised that both he and "Crunch" had the "other situation" under control. Based on the context of the conversation and my training and experience, I believe BAINS was referring to machinegun conversion devices (MCDs) when he stated, "other situation". BAINS stated that he and "Crunch" had partnered up on some deals before, and he wanted to make sure he had set up a "nice pipeline" for the CI. The conversation continued with "Crunch" talking to the CI stating he, "Crunch" had a lead on "five (5) or six (6) of them right now". BAINS interjected and stated, "Also, on the one situation… the fully. And the Casper." Based on my training, experience, and conversations with other law enforcement personnel, I know the term "Casper" is a term utilized to describe firearms without manufacturer markings, commonly referred to as "Ghost Guns." The CI and "Crunch" continued to speak about firearms that "Crunch" had access to as well as the price of firearms. At the conclusion of the aforementioned conversation, BAINS told

the CI that he, BAINS, and "Crunch" would get together firearms for the CI to purchase. BAINS continued suggesting all three, BAINS, "Crunch", and the CI, meet later in the day. The CI contacted BAINS several times after the three-way conversation with "Crunch" attempting to set up a controlled purchase. BAINS told the CI that he, BAINS, was unable to get in contact with "Crunch". As such, BAINS and the CI agreed to meet at a later date.

7.    ATF conducted a review of court authorized collection of incoming and outgoing communications for BAINS' telephone number, 502-836-4825. Through a review of this information, ATF identified BAINS had contact with telephone number 502-302-2995 multiple times on October 30, 2024. The timing of the communications between BAINS' telephone number and 502-302-2995 coincided with the statements made by BAINS to the CI that he, BAINS, was attempting to contact "Crunch". ATF also identified communication between BAINS' telephone number and 502-302-2995 just prior to the above-mentioned conversation where it appeared BAINS and "Crunch" were together. As such, law enforcement believed telephone number 502-302-2995 was being used by "Crunch". ATF conducted research in an attempt to identify the user of telephone number 502-302-2995. ATF located a Louisville Metro Police Department (LMPD) report identified as LMPD Report Number LMPD24021496. According to the LMPD report, on or about February 22, 2024, LMPD officers responded to 3504 Garland Avenue, Louisville, Kentucky 40211 for a ShotSpotter[1] notification. On scene officers located a vehicle parked behind the residence. Officers observed a large container of marijuana,

---

[1] ShotSpotter uses an array of acoustic sensors that are connected wirelessly to ShotSpotter's centralized, cloud-based application to reliably detect and accurately locate gunshots using triangulation. Each acoustic sensor captures the precise time and audio associated with impulsive sounds that may represent gunfire. This data is used to locate the incident and is then filtered by sophisticated machine algorithms to classify the event as a potential gunshot.

what appeared to be a large amount of US currency, and a pistol magazine inside the vehicle in plain view. As officers were conducting their investigation, they observed an older male walking into 3504 Garland Avenue. Officers asked him if the listed vehicle belonged to him to which he replied, "No it belongs to guy who lives downstairs." Shortly afterwards, officers were confronted by GARDNER. GARDNER approached officers and asked, "Why are you looking at my car?" When officers asked if the car belonged to him, GARDNER denied the vehicle was his and stated: "It's my girl's car, but I drive it sometimes." GARDNER then asked officers if he was detained and attempted to walk away. When GARDNER approached officers, he came from 3504 Garland Avenue. According to the LMPD report, 3504 Garland Avenue is split into multiple different apartments and officers were unable to tell exactly which apartment or room he walked out of. Officer repeatedly asked GARDNER if he lived at the location but he repeatedly denied. Officers detained GARDNER and performed a probable cause search of the vehicle. Upon closer inspection, LMPD identified the US Currency was fake or prop money marked with "Copy" or "For Motion Picture Use Only". After collecting the prop money and marijuana as evidence, officers retraced the path of GARDNER and located a black in color Ruger 9mm pistol. The referenced LMPD report identified 734 South 35th Street as GARDNER's home address and identified telephone number 502-302-2995 as belonging to GARDNER.

8. ATF located an additional LMPD report, LMPD report number LMPD24148634 referencing GARDNER as a suspect. This report also listed 734 South 35th Street GARDNER's home address and telephone number 502-302-2995 as belonging to GARDNER. According to the report, on or about December 24, 2024, LMPD officers

were dispatched on a suspicious vehicle when they heard approximately six (6) rounds fired. At approximately 1:08 PM, LMPD received a ShotSpotter notification identifying the shooting location as 739 Sutcliffe Avenue, Louisville, Kentucky 40211. The below picture shows the location of the ShotSpotter notification, and GARDNER's home address are located approximately 422 feet apart.



9.  While officers were enroute, an update was received that a light skin male, wearing a grey and cranberry jacket, was possibly the person that fired the rounds. While in the area officers observed GARDNER walking north on South 35th Street. When officer turned around, GARDNER had already entered a home located at 662 South 35th Street, Louisville, Kentucky. LMPD then observed GARDNER walking in the alley behind 662 South 35th Street and began to give verbal commands to stop and show his hands. As depicted in the below picture, the residence located at 662 South 35th Street and GARDNER's home address are approximately 897 feet apart.



10. LMPD stated GARDNER was verbally noncompliant and was refusing to walk to officers. GARDNER kept telling the officer to, "Shoot me in the head." Officer eventually made an approach and detained GARDNER. LMPD did not locate a weapon upon contact with GARDNER. Officers checked where a witness had seen the suspect matching suspect description running from the rear of the house. Witness stated that he observed a male wearing what GARDNER was wearing run between two houses on Sutcliffe then heard shots and observed the suspect run back between the houses with his hood up but never saw the suspect fire the weapon. ATF conducted a review of fixed surveillance covering GARDNER's residence for December 24, 2024, around the time of the aforementioned incident. ATF made the following observations, all times are approximate:

    a. 1:08 PM:  ShotSpotter notification at 739 Sutcliffe Avenue (approximately two blocks directly behind GARDNER's residence)

    b.  1:12 PM: GARDNER leaves his residence in a red, white, and blue puffer jacket walking north on South 35th then turning left onto West Broadway.

    c.  1:19 PM: Suspected girlfriend of GARDNER and unknown male leave in maroon Chevrolet Cruze.

    d.  1:20 PM: GARDNER detained at 664 South 35th Street per call for service report.

    e.  1:56 PM: GARDNER returned to his residence with suspected girlfriend and unknown male in the Chevrolet Cruze. GARDNER walks to the backyard of the residence while holding his waistband and looking around.

    f.  2:07 PM: Suspected girlfriend exited 734 South 35th Street and places a white bag in the trunk of the vehicle then immediately goes back inside the residence.

11. ATF also conducted a search of multiple commercial databases for telephone number 502-302-2995. The database search results associated this telephone number with GARDNER. Additionally, GARDNER's Kentucky issued driver's license listed 735 South 35th Street as GARDNER's address of record.

12. On or about November 3, 2024, the CI and BAINS communicated attempting to set up a controlled purchase of firearms. BAINS told the CI that the number of firearms he, BAINS, would have for the deal would "be a little light" as there was too much going on and it was "too hot". Based on my training, experience, and conversations with other law enforcement personnel, I know the phrase "too hot" is often used by criminals when they believe law enforcement may be in the area and/or conducting an investigation. BAINS continued stating he did not want to take any unnecessary risks, and that "Crunch" was nervous about the deal. BAINS then directed the CI to download WhatsApp2. BAINS

---

2 WhatsApp (officially WhatsApp Messenger) is an instant messaging (IM) and voice-over-IP (VoIP) service owned by technology conglomerate Meta. It allows users to send text, voice messages and video messages, make voice and

told the CI that WhatsApp would help in not being detected by law enforcement. At approximately 6:02 PM, BAINS texted the CI an address of "600 South 35th Street" as the proposed meeting location for the controlled purchase. A few minutes later, the CI called BAINS and confirmed the time of the meeting. BAINS again stated the meeting would take place near 35th Street and West Broadway near the Walgreens. BAINS continued stating the address was "his homie's" residence. Of note, there is a Walgreens pharmacy located on the southeast corner of West Broadway and South 35th Street. The Walgreens is located approximately 422 feet from GARDNER's residence. The CI responded that he/she did not feel comfortable with meeting at the unknown individual's residence. BAINS advised they could not meet at his liquor store because his business partner was there and that the above address was only an option. BAINS then stated that no one wanted to carry around all the firearms or be out in the open. BAINS then proposed they could conduct the deal in the parking lot of the liquor store, to which the CI agreed. BAINS advised the area where the meeting was proposed on South 35th Street is a bad area and that he, BAINS, is often scared to go down there. BAINS advised he would call "Crunch" back and if it did not work out, they were just going to move on and not conduct the deal. BAINS further stated he was wasting time going back and forth between the CI and "Crunch". BAINS advised he would contact "Crunch" again and let the CI know if the deal was going to happen. At approximately 6:54 PM, BAINS texted the CI and stated, "Bro we gonna have to take rain check for tonight. Too much going on and I've got some things to take care of and I have court in the morning." The planned

---

video calls, and share images, documents, user locations, and other content. WhatsApp's client application runs on mobile devices and can be accessed from computers. The service requires a cellular mobile telephone number to sign up.

controlled purchase between the CI, BAINS, and GARDNER, also known as "Crunch",

did not occur. Through a review of court authorized collection of incoming and outgoing

communications for BAINS' telephone number 502-836-4825, ATF identified that on

November 3, 2024, telephone number 502-302-2995 and BAINS's telephone number had

seven (7) voice calls and six (6) text messages. As previously noted, multiple sources

associated telephone number 502-302-2995 with GARDNER.

13. On or about November 25, 2024, ATF Special Agent Matthew Longworth contacted

BAINS via telephone number 502-836-4825. For background, SA Longworth previously

spoke with BAINS about being a confidential informant for the ATF following the arrest

of BAINS by Clarksville Indiana Police Department. Due to BAINS' federal

probationary status, ATF did not pursue BAINS as a confidential informant.

Additionally, ATF learned BAINS was likely engaged in illegal firearms trafficking.

With this information, BAINS became a subject of captioned investigation. BAINS

continued to contact SA Longworth and provide SA Longworth with information. During

the phone call on November 25, 2024, BAINS sent SA Longworth multiple pictures of

firearms. Three (3) of the photographs sent by BAINS depicted an AR-15-type rifle with

what appeared to be a firearm silencer[3] attached.

---

[3] The term "Firearm Silencer" or "Firearm Muffler" means any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, any part intended only for use in such assembly or fabrication.







14. Continuing on or about November 25, 2024, BAINS sent SA Longworth eight (8)

pictures of another AR-15-type rifle.

 

 

 





15. SA Longworth questioned BAINS about how he obtained the pictures of the referenced
    rifles. BAINS stated to SA Longworth that a middleman sent the photographs to BAINS.
    BAINS identified the middleman as "Crunch". BAINS advised "Crunch" was not very
    trusting and he had not opened up to him much.  BAINS described "Crunch" as a mixed-
    race male and advised "Crunch" had also shown him, BAINS, the AR-style rifle with the
    firearm silencer pictured above. BAINS stated he had physically handled the firearm and
    laid it up against the wall (as pictured) while he was with "Crunch".  BAINS advised he

tried to get a close-up photograph of the silencer on the rifle. BAINS stated "Crunch" was shooting the firearm in the backyard and he, BAINS, was impressed with how quiet it was. BAINS continued stating he was familiar with firearm silencers and had owned three (3) firearm silencers previously. BAINS advised his knowledge of firearm silencers helped give him some credibility with the individuals selling them. BAINS advised "Crunch" was involved in multiple different illegal activities, including selling stolen cars, "chop shop" engines, motorcycles, and anything that could be bought or sold. SA Longworth inquired if BAINS could provide any additional information on "Crunch," such as a phone number. BAINS stated "Crunch" uses a "TextNow" phone number, but he knew "Crunch" lived off 35th Street in Louisville. BAINS stated it appeared as though "Crunch" ran the entire block of 35th Street and had his "hands in everything." BAINS also stated he was afraid of getting robbed when he was around "Crunch". Later in the conversation, BAINS again brought up the silver AR-15-type rifle, stating he, BAINS, was not expecting to be in the room with the rifle when he observed it. BAINS asked SA Longworth if he noticed anything special about the rifle from the photographs. SA Longworth stated he observed that the rifle appeared to be privately made and had no manufacturer markings or serial number. BAINS then brought up that the silver AR-15-type rifle came from the same individual as the black AR-15-type rifle with the attached firearm silencer. BAINS confirmed that the individual who had those firearms was "Crunch". During the aforementioned conversations, BAINS provided SA Longworth with additional information about other potential sources of firearms.

16. On or about December 11, 2024, the CI and BAINS communicated about setting up a controlled purchase of firearms and narcotics. BAINS called the CI via "WhatsApp".

BAINS advised he had not had time to contact the CI as he had been busy on the phone and taking care of other business. BAINS then discussed the AR-15-type rifle with the firearm silencer which he had previously informed the CI he was going to obtain from GARDNER. BAINS advised from that point forward he would just give the CI the firearms he had on hand and any that he was unable to obtain he would get to the CI on the next time around.

17. Continuing on or about December 11, 2024, BAINS advised he had everything together for the CI and wanted the CI to come to the Liquor Palace to purchase what he had currently. BAINS stated he did not want to sit on a stockpile of inventory for long and requested the CI come by that night. BAINS advised he had someone, through investigation identified as GARDNER, coming to the Liquor Palace right then to deliver the AR-15-type rifle with the firearm silencer. The CI advised he/she would try to get his driver to come back the following day, and they could conduct the deal then. BAINS then stated that the individual bringing him the AR-15-type rifle with the firearm silencer was calling him and concluded the conversation.

18. On the same date, at approximately 9:58 PM, the CI video called BAINS via "WhatsApp". BAINS and the CI discussed narcotics prices. The CI then inquired what the price was for the AR-15-type rifle with the firearm silencer. BAINS stated the seller of that firearm was at his store as they spoke. BAINS then showed the CI GARDNER, who started to join in on the phone conversation, before the CI asked BAINS not to share his/her personal business. BAINS stated in order to get the AR-15-type rifle with the firearm silencer, he would have to give GARDNER some "exclusive" items in exchange. BAINS then provided a price of $1,500.00 USD for the rifle. BAINS then showed the CI

a Keltec 9mm carbine rifle with a collapsable stock and inquired if the CI wished to purchase it. BAINS advised he had around five hundred (500) to eight hundred (800) blue fentanyl pills. BAINS then brought up MCDs and stated he could obtain some, but the price would be at least $500.00 USD per MCD. BAINS stated the CI would have to be there when the source of the MCDs arrived, as he would have to use the CI's money to make the purchase.

19. BAINS stated the source of the MCDs was coming that night, to which the CI stated he/she could not conduct the deal as he/she was no longer in Louisville. The CI then requested to meet BAINS the following morning, on December 12, 2024. BAINS advised he was going to finish the deal with GARDNER and would have to get off the phone, but that he would like for the CI to come to the Liquor Palace right then to conduct the deal. BAINS advised he would call the CI later and the conversation ended.

20. ATF conducted a review of fixed surveillance at both GARDNER's residence and BAINS' Liquor Palace. Additionally, on the evening of December 11, 2024, toll records showed BAINS receiving several calls from GARDNER. ATF identified the first set of calls was at approximately 9:14 PM. At approximately 9:24 PM, surveillance showed GARDNER leaving his residence and entering the passenger seat of his vehicle. Still photographs from the surveillance footage can be found below:





21. Per toll records, on the same date, at approximately 9:43 PM, GARDNER called BAINS.
At approximately 9:44 PM, ATF observed GARDNER arrive in the parking lot of the
Liquor Palace in the same vehicle.  GARDNER then retrieved a large item from the
vehicle's trunk and re-entered the passenger seat of the vehicle with the item.  Still
photographs from the fixed surveillance at the Liquor Palace can be found below:



22. At approximately 9:52 PM, BAINS arrived at the Liquor Palace in his white Ford F250. GARDNER exited the vehicle and walked into the business, accompanied by BAINS. Surveillance observed GARDNER carrying a large bag as he entered the business. At approximately 10:18 PM, GARDNER exited the business with a bag and re-entered the passenger seat of the vehicle. The vehicle then left the property and returned to GARDNER's residence a short time later. With this information, ATF was able to confirm that GARDNER was with BAINS at approximately 9:58 PM when BAINS spoke with the CI via "WhatsApp". Still photographs from the fixed surveillance can be found below:



23. On December 12, 2024, at approximately 9:18 AM, BAINS texted the CI and requested he/she call him. A short time later, the CI called BAINS via "WhatsApp". BAINS advised he was about to go pick up a trailer and requested the CI come to the Liquor Palace around 11:00 to 11:30 AM that day. BAINS then confirmed that the CI wanted two (2) pounds of methamphetamine. The CI advised he/she was about to get ready and ended the conversation.

24. On the same date, at approximately 10:49 AM, the CI called BAINS via "WhatsApp" to let him know he/she was on the way to the Liquor Palace.

25. The CI, accompanied by an ATF Undercover Special Agent (UC), arrived at the Liquor Palace a short time later. The UC and CI conducted a recorded controlled purchase from BAINS for six (6) firearms, one (1) Glock-type MCD, and two (2) pounds of suspected methamphetamine, for a total price of $8,650.00 USD. A description of the purchased items can be found below:

   a. Privately Made Firearm, .300 Blackout, semi-automatic rifle, bearing no serial number, equipped with a firearm silencer

- This firearm appears to be the same firearm that BAINS told SA Longworth GARDNER possessed, the AR-15-type rifle with the firearm silencer

b. DelTon DTI-15, 5.56 cal, semi-automatic pistol, bearing serial number B90313

c. Cobray M-11/Nine, 9mm, semi-automatic pistol, bearing serial number 85-0003573

d. Smith and Wesson M&P 380 Shield EZ, .380 auto, semi-automatic pistol, bearing serial number NFV4228

e. Glock 43X, 9mm, semi-automatic pistol, bearing serial number BLYG103

f. Glock 45, 9mm, semi-automatic pistol, bearing serial number (purchased for

g. 3D-printed Glock type MCD

h. Approximately two (2) pounds of suspected methamphetamine

26. Photographs of the purchased items can be found below:





27. While the December 12, 2024, controlled purchase was being conducted, law enforcement observed GARDNER arrive at the Liquor Palace with an unidentified white male and an unidentified white female. Surveillance observed GARDNER drop off a black in color enclosed trailer in the parking lot of BAINS' liquor store. The contents of the trailer are unknown. Throughout the entirety of the controlled purchase, GARDNER, and his unknown associates, continued to circle the store both on foot and in vehicles, as if they were watching for law enforcement. Below is a still photograph from fixed surveillance of GARDNER dropping off the trailer:



f











28. After the CI and the UC left the Liquor Palace, surveillance observed GARDNER meet BAINS in the parking lot of the store. BAINS and GARDNER looked inside the trailer, before closing the trailer and entering the store together. Still photographs from the fixed surveillance can be found below:





29. On January 6, 2025, law enforcement obtained federal search warrants for BAINS' Liquor

Palace and GARDNER's residence.   On January 10, 2025, ATF executed the search

warrants. BAINS was present during the execution of the search warrant at the Liquor

Palace and was taken into custody pursuant to a federal arrest warrant.   The search resulted

in the seizure of thirty-one (31) firearms, various narcotics, and U.S. currency. During the

course of the search warrant at the Liquor Palace, law enforcement located BAINS'

personal vehicle in the parking lot, which was hooked to the same black enclosed trailer

that GARDNER had dropped off several weeks prior.  A photograph of BAINS vehicle attached to the trailer can be found below:



30. During the execution of the search warrant at GARDNER's residence on the same date, law enforcement encountered GARDNER inside the residence, who was initially non-compliant.  GARDNER was eventually safely taken into custody. During the subsequent search of the residence, law enforcement located and seized a Taurus TS9, 9mm, semi-automatic pistol bearing serial number AEK750953, in the rear room of the residence. It should be noted, this room contained all of GARDNER's clothing and personal items.

31. GARDNER's girlfriend, identified as Shelley Richards (W/F, DOB: 02/28/1984), was also present during the execution of the warrant. Law enforcement detained Richards and verbally read Richards her Miranda Rights, at which time Richards stated she understood her rights and was willing to speak with Agents.  During the interview, Richards advised the firearm located in the rear room belonged to GARDNER.  Richards informed Agents she had observed GARDNER in possession of firearms several times in the past.  Richards re-iterated that no firearms or ammunition located inside the residence belonged to her and

that the rear room was GARDNER's personal room. This concluded the interview with Richards.

32. With this information, GARDNER was taken into custody by the Louisville Metropolitan Police Department (LMPD) for the charge of Felon in Possession of a Firearm as well as his active warrant. GARDNER refused to speak with law enforcement regarding the firearm.

33. While ATF was securing the scene at GARDNER's residence, Agents located a camper parked in the rear adjacent lot, located at 732 S. 35th Street. It should be noted, GARDNER had installed a makeshift fence that ran across the vacant property and appeared to maintain control of the property. In addition, law enforcement had observed power cords running from the camper to GARDNER's residence. ATF personnel attempted to hail out an unidentified individual who was inside the camper but were ultimately unsuccessful. Due to the fact the camper was not specifically included in the search warrant and was not located directly on GARDNER's property, no entry was made into the camper.

34. Continuing on January 10, 2025, ATF transported BAINS to the ATF Louisville Field Office in order to conduct an interview with BAINS. Agents informed BAINS of his Miranda Rights prior to beginning the interview, at which time BAINS advised he understood his rights and was willing to speak with Agents. During the interview, BAINS informed law enforcement that he had obtained numerous firearms from GARDNER, which he in turn sold to the ATF CI. BAINS stated numerous firearms located inside the Liquor Palace during the search warrant were procured from GARDNER as well. BAINS advised he had been to GARDNER's residence (734 South 35th Street) several times but had never been inside. BAINS further stated that the majority of firearms and/or narcotics

deals with GARDNER were conducted inside the camper behind GARDNER's residence. Law enforcement showed BAINS a photograph of the camper they observed on the adjacent property, which BAINS confirmed. BAINS advised he had been in the camper numerous times and most recently within the last month.

35. After GARDNER was transported to the Louisville Metropolitan Department of Corrections (LMDC), law enforcement began to listen to jail phone calls made from GARDNER to Richards. GARDNER made several statements directing Richards to contact individuals so they can remove items from the camper. GARDNER alluded to the fact that there was illegal contraband inside the camper that law enforcement had not seized during the search warrant.

36. With this information, as well as information provided by BAINS, ATF obtained an additional federal search warrant for the camper located at 732 South 35th Street. On the same date, ATF executed the search warrant at the camper, which was unoccupied at the time of their arrival. During the search, law enforcement located an Iver Johnson Arms, .30 caliber, semi-automatic, short-barrel rifle bearing serial number BA05782. It should be noted, the firearm is in violation of the National Firearms Act (NFA), as it is a rifle with a barrel length less than 16 inches. Law enforcement believes this firearm to be the illicit item GARDNER was referring to during his jail phone calls. The firearm was seized as

evidence and transported to the ATF Louisville Field Office. A photograph of the seized firearm can be found below:



37. Through a review of electronic court documents, ATF confirmed GARDNER to be a convicted felon. Electronic court documents revealed GARDNER pleaded or was found guilty of the following felony offenses:

    a.   Marshall County Indiana Superior Court Case 50D01-1109-FB-000029

        i.   Theft

    b.   Jefferson County Kentucky Circuit Court Case 18-CR-000490

        i.   Convicted Felon in Possession of a Handgun

        ii.   Enhanced Possession of Marijuana

    c.   Jefferson County Kentucky Circuit Court Case 20-CR-00227

        i.   Possession of Controlled Substance, 1st Degree, 1st Offense (Methamphetamine)

        ii.   Complicity to Receiving Stolen Property $10,000 or More

        iii.   Complicity to Fleeing or Evading Police, 1st Degree (Motor Vehicle)

    iv.  Complicity to Wanton Endangerment, 1st Degree, Police Officer (Three (3) Counts)

    v.  Complicity Criminal Mischief, 1st Degree (Three (3) Counts)

  d.  Jefferson County Kentucky Circuit Court Case 20-CR-000590

    i.  Receiving Stolen Property Under $10,000

38. Your affiant queried ATF Interstate Nexus Expert Special Agent (S/A) Michael McLaurine in to determine if the firearms seized in the execution of the above listed federal search warrants were manufactured in the Commonwealth of Kentucky. S/A McLaurine indicated the firearms were manufactured outside of the Commonwealth of Kentucky or affected interstate commerce.

39. Based on the above facts and circumstances, as well as this Affiant's training and experience, Affiant states that there is probable cause to believe that GARDNER has committed violations of 18 USC 922(g)(1), 18 USC 933, and 18 USC 371.

s/Matthew Longworth

Matthew J. Longworth

Special Agent, ATF

Sworn to me and subscribed by telephone in accordance with Fed. R. Crim. P. 4.1 and 41(d)(3) on the 13th day of January 2025.

COLIN H. LINDSAY
UNITED STATES MAGISTRATE JUDGE